UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CRAIG MOSS,

                        Plaintiff,

             -against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

21 Civ. 01352 (JCM)

Plaintiff Craig Moss ("Plaintiff") commenced this action on February 16, 2021 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Social Security Income ("SSI"). (Docket No. 1).  Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 18), accompanied by a memorandum of law ("Pl. Br."), (Docket No. 19); (2) the Commissioner's cross-motion for judgment on the pleadings and in opposition to Plaintiff's motion, (Docket No. 20), accompanied by a memorandum of law ("Comm'r Br."), (Docket No. 21); and (3) Plaintiff's reply in support of Plaintiff's motion for judgment on the pleadings ("Pl. Reply Br."), (Docket No. 22).  For the reasons set forth below, Plaintiff's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings consistent with this Opinion.

## I. BACKGROUND

Plaintiff was born on October 23, 1964. (R.[1] 114).  Plaintiff applied for SSI on April 25,

---

[1] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on July 20, 2021. (Docket No. 13).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

2016. (R. 253-73).  In the application, Plaintiff alleged a disability onset date of April 14, 2016.

(R. 254).  Plaintiff's application was initially denied on August 16, 2016, (R. 114-25), after

which he requested a hearing on August 29, 2016. (R. 142-44).  A video hearing was held on

December 6, 2018 before Administrative Law Judge ("ALJ") Dina Loewy. (R. 68-113).  ALJ

Loewy issued a decision on July 30, 2019, denying Plaintiff's claim. (R. 27-38).  Plaintiff

requested review by the Appeals Council, which was granted on September 21, 2020. (R. 7).  On

December 22, 2020, the Appeals Council issued a partially favorable decision, determining that

Plaintiff became disabled on July 30, 2019, when he was within three months of turning 55 and

met the higher category of "advanced age" and satisfied the requirements of a special profile. (R.

7-11).  Thus, the Appeals Council's decision is the Commissioner's final decision reviewable by

this Court.[2] 20 C.F.R. §§ 404.981, 416.1481; *see Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Plaintiff now appeals the denial of his benefits from his alleged disability onset date of April 14,

2016 to July 30, 2019. (Pl. Br. at 4).

**A.  Medical Evidence Relating to Plaintiff's Physical Impairments[3]**

**1.  MLK Wellness Center**

Plaintiff received treatment for his back pain and asthma at the MLK Wellness Center

from February 2016 through March 2018. (R. 375, 380-81, 391, 568-72, 593-99, 619-26, 632-34,

641-44, 726-28, 731-32, 736-37).

**i.  Edgard Salazar, M.D.**

Plaintiff saw Edgard Salazar, M.D. ("Dr. Salazar") at MLK Wellness Center from

February through August 2016.  (R. 380-81, 391, 568-72, 619-26).  During each of these visits,

---

[2] In this Opinion, the Court addresses the issues raised by Plaintiff with the ALJ's decision as adopted by the Appeals Council.  Plaintiff does not dispute the Appeals Council's conclusion regarding his age category.

[3] The Court only summarizes the medical evidence relevant to the issues raised in this matter.

Dr. Salazar assessed mild, persistent asthma and back pain. (R. 391, 568-72, 625).  On February 2, 2016, Plaintiff presented for a routine physical examination, complaining of chronic back pain that he rated at a two out of ten, as well as benign hypertension, acute rhinitis and other acute pain. (R. 568-71).  Upon examination, Plaintiff had normal respiratory, musculoskeletal and neurological findings. (R. 570).

On May 7, 2016, Plaintiff presented with chronic joint pain, and an examination revealed arthritis and back pain. (R. 380-81, 391).  On August 20, 2016, Dr. Salazar indicated that Plaintiff's lungs were clear to auscultation bilaterally, and that he had normal respiratory, neurological and musculoskeletal findings except for limited ranges of motion and decreased strength in his back. (R. 621).

**ii.  Maya Aponte, M.D.**

Plaintiff saw Maya Aponte, M.D. ("Dr. Aponte") at MLK Wellness Center on September 24, and November 19, 2016. (R. 632-34, 641-44).  At both visits, Dr. Aponte indicated that Plaintiff's lungs were clear to auscultation, he had normal respiration, had a normal gait, and could easily transfer from sitting to standing positions. (R. 634, 643).  Dr. Aponte assessed chronic back pain and mild, persistent asthma. (*Id.*).  At the November visit, his PHQ-9 score was 22, indicating severe depression.[4] (R. 641).

---

[4] The 9-question Patient Health Questionnaire (PHQ-9) is a self-administered diagnostic tool "for assessing depression." *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, AMERICAN PSYCHOLOGICAL ASSOCIATION, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last visited September 20, 2022).  A score above 20 indicates severe depression. *Instruction Manual, Instructions for Patient Health Questionnaire (PHQ) and GAD-7 Measures*, PRIMARY CARE COLLABORATIVE, https://www.pcpcc.org/sites/default/files/resources/instructions.pdf (last visited September 20, 2022).

### iii.  Physical Therapy[5]

On April 28, 2016, Plaintiff saw Jennifer Roxas ("PT Roxas"), a physical therapist, at MLK Wellness Center. (R. 593-99).  Plaintiff had attended physical therapy before as well as received epidural injections, but neither made his pain go away, so he was referred back to physical therapy. (R. 594).  PT Roxas noted that Plaintiff suffered from chronic back pain for the past three years that was aggravated by heavy lifting when he used to exercise, and noted that he wore a back brace but did not have a limp. (*Id.*).  Plaintiff reported being able to sit or stand for fifteen minutes at a time, but indicated that he had difficulty transferring from a sitting to a standing position and bending to put on his lower garments. (R. 595).  PT Roxas assessed that Plaintiff's functional level at the time of evaluation was independent with minimal to moderate difficulty, and she recommended physical therapy twice per week for twelve visits. (R. 597).

On May 17, 2016, physical therapist Priti Gujral ("PT Gujral") noted that Plaintiff complained of back pain that was greater in his lower back. (R. 375).  His pain persisted despite an epidural injection and prior physical therapy. (*Id.*).

### iv.  Kesha-Gaye Anderson, M.D.

On March 8, 2018, Plaintiff saw Kesha-Gaye Anderson, M.D. ("Dr. Anderson") at MLK Wellness Center, complaining of chronic back pain with herniated disc, asthma, anxiety disorder and dysthymia. (R. 726).  Dr. Anderson noted that Plaintiff's lungs were clear to auscultation bilaterally, his respirations were non-labored, and his musculoskeletal and neurological examination findings were normal. (R. 727).  Plaintiff's BMI was 32.4. (*Id.*).  Dr. Anderson assessed chronic back pain and persistent asthma. (R. 727-28).

---

[5] "Although physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence." *Ortiz v. Saul*, 1:19-cv-00942(ALC), 2020 WL 1150213, at *7 (S.D.N.Y. Mar. 10, 2020); 20 C.F.R. § 404.1502.

At a follow-up visit on March 23, 2018, Plaintiff presented with exertional angina, chronic back pain with herniated disc, asthma, anxiety disorder and dysthymia. (R. 736).  His BMI was 31.7. (R. 737).

**v.  Misbahuddin Khaja, M.D.**

On March 19, 2018, Plaintiff saw Misbahuddin Khaja, M.D. ("Dr. Khaja") at MLK Wellness Center for a pulmonary outpatient visit, presenting with dyspnea on exertion. (R. 731). Dr. Khaja assessed Plaintiff with moderate, persistent asthma. (R. 732).  In addition, Plaintiff's asthma was uncontrolled and he was non-adherent to medications. (*Id*.).  His BMI was 31.7. (R. 731).

**2.  Darren Esposito, M.D.**

On April 28, 2016, Darren Esposito, M.D. ("Dr. Esposito") completed a form relating to Plaintiff's care for his elderly mother, in which he indicated that she had been disabled since 2013 due to chronic obstructive pulmonary disease, atrial fibrillation and lung cancer. (R. 371). Dr. Esposito noted that Plaintiff's mother required home care services or a home attendant and that Plaintiff had been providing that care. (*Id*.).  Dr. Esposito specified that Plaintiff's mother required assistance to ambulate outside the house and to prepare meals, and that she could only be left alone for four hours each day. (*Id*.).

**3.  Carol McLean Long, M.D. – Internal Medicine Consultative Examination**

On July 14, 2016, Plaintiff had an internal medicine consultative examination with Carol McLean Long, M.D. ("Dr. McLean Long"). (R. 427-31).  Plaintiff complained of high blood pressure, asthma, depression, back pain, neck problems, allergies and insomnia. (R. 427).  He reported that his back pain began around 2014, and that he was told by his primary care physician ("PCP") that he had disc disease in his lower back and neck. (*Id*.).  His PCP prescribed

Percocet and physical therapy, and gave him two epidural injections, none of which helped. (*Id.*).
At the time of the consultative examination, Plaintiff was taking eight medications. (R. 428).

Plaintiff stated that he could walk half a block which took him five to six minutes; sit for
one to two minutes; stand for one to two minutes; and go up a flight of stairs. (R. 427).  He
reported that he does not really cook or clean; rather, he uses the microwave and paper plates. (R.
428).  His friends occasionally helped him with his laundry. (*Id.*).  Plaintiff stated that he could
shop for a loaf of bread but not much else because it was hard for him to stand. (*Id.*).  He could
shower and dress himself, but sometimes needed help getting into and out of the bathtub and
putting on shorts, pants and shoes. (*Id.*).  Plaintiff spent his time watching television and reading.
(*Id.*).

On examination, Plaintiff appeared to be in no acute distress; had a normal gait and
stance; could walk on his heels and toes while holding on to something; could squat one fourth
of the way down; used no assistive devices; was basically able to dress without any assistance;
needed no help getting on and off the exam table; and was able to rise from a chair without
difficulty. (R. 429).  Plaintiff's lungs were clear to auscultation. (*Id.*).  Dr. McLean Long
remarked that the musculoskeletal findings "showed a bit of poor effort," and revealed twenty
degrees of cervical flexion/extension, cervical lateral flexion, and lumbar flexion/extension with
full lumbar lateral flexion bilaterally. (*Id.*)  Plaintiff had a positive straight leg raise test on the
right in the supine and sitting positions, and a negative straight leg raise test on the left. (R. 429-
30).  Plaintiff was able to bend, kneel and put his shoes on bilaterally. (R. 430).  Plaintiff's
shoulders had forward elevation and abduction bilaterally of about 90 degrees, adduction of 20
degrees, internal rotation of 40 degrees, and external rotation of 50 degrees. (*Id.*).  Plaintiff had
full range of motion in his elbows, forearms and wrists bilaterally, and some reduced range of

motion in his hips, knees and ankles bilaterally. (*Id*.).  Plaintiff did not have any sensory deficit or muscle atrophy; had full strength in his upper and lower extremities and in his hand grip; and had intact hand and finger dexterity. (*Id*.).

Dr. McLean Long diagnosed Plaintiff with hypertension, asthma, back and neck pain, rule out radicular symptoms, allergies and insomnia. (*Id*.).  She assessed mild to moderate limitations in Plaintiff's abilities to sit, stand, walk, climb, push, pull and carry heavy objects, secondary to his effort during the examination. (R. 431).  Dr. McClean Long also opined that Plaintiff should avoid smoke, dust, fumes and other respiratory irritants due to his asthma. (*Id*.).

### 4.  Tamer Elbaz, M.D.

From September 29, 2016 through September 10, 2018, Tamer Elbaz, M.D. ("Dr. Elbaz"), a pain management specialist at Pain Physicians NY, treated Plaintiff for neck and lower back pain. (R. 467-552).  Throughout these visits, Plaintiff had 4/5 muscle strength in his arms and legs and decreased range of motion in his arms, legs and spine. (R. 467, 471, 483, 485, 487, 489, 491, 493, 495, 499, 506).  Dr. Elbaz also observed positive Spurling's test, (R. 467, 518, 522, 550), left and right arm pain, and tenderness in the left and right trapezius muscles, (R. 467), as well as paraspinal tenderness, (R. 467, 477, 479, 483, 485, 487, 489, 491, 493, 506, 518, 522, 534, 538, 542, 546, 550).  Plaintiff also had a positive straight leg raise test at 30 degrees bilaterally. (R. 467, 477, 483, 487, 493, 495, 499, 506, 518, 522, 534, 537, 542, 546, 550).  Plaintiff was diagnosed with radiculopathy of the lumbar and cervical spines, as well as spondylosis with radiculopathy in the lumbar region. (R. 467, 471, 475, 477, 479, 483, 485, 487, 489, 491, 493, 495, 499, 506, 518, 522, 534, 538-39, 543, 547, 550-51).

At the September 29, 2016 visit, Dr. Elbaz recommended an epidural steroid injection as well as physical therapy, exercises and lifestyle modifications, which Plaintiff agreed to do. (R. 468).  On October 27, 2016, Plaintiff reported that his back pain was aggravated with standing

and sitting for prolonged periods of time, but relieved with laying down and pain medication. (R. 487).  His neck pain was aggravated by neck movements, and he also noted that he experienced daily headaches. (R. 488).  At visits from November 7, 2016 through May 7, 2018, Dr. Elbaz administered epidural steroid injections to Plaintiff's lumbar spine, which provided him with more than 80% pain relief. (R. 471-72, 515, 535-36).  At his November 28, 2016 visit, Plaintiff noted that his lower back pain was aggravated by walking, bending and climbing steps, but alleviated by rest and pain medication. (R. 474).  On December 23, 2016, Plaintiff stated that standing and walking for a prolonged period of time exacerbated his lower back pain. (R. 476).  In addition, moving his neck and upper extremities aggravated his neck pain. (*Id*.).  On February 17 and March 17, 2017, Plaintiff complained that his lower back pain was getting slightly worse and that his neck pain had remained unchanged. (R. 479-80, 482).  At the February visit, Dr. Elbaz increased Plaintiff's dose of Neurontin to 400 mg for better relief and added meloxicam and baclofen to his medication regimen. (R. 479).  On April 14, 2017, Dr. Elbaz counseled Plaintiff against increasing his pain medication due to his concurrent use of a high dose of Xanax, and instead recommended another epidural steroid injection to which Plaintiff agreed. (R. 483).  At a visit on June 22, 2017, Plaintiff reported that past epidural injections had not offered any relief and expressed interest in a lumbar radiofrequency ablation procedure. (R. 492).  On August 17, 2017, Plaintiff indicated that his back and neck pain had worsened and the pain medications provided only moderate relief. (R. 496).  Plaintiff received a trigger point injection to treat his myalgia on November 9, 2017. (R. 507).  On January 18 and February 15, 2018, Plaintiff said that his back pain remained severe and that he felt it was worsening over time. (R. 517, 521).  On May 7, 2018, Plaintiff stated that his chronic back pain was worse that day and he received a lumbar medial branch nerve injection. (R. 533-36).  At a visit on June 4, 2018,

Plaintiff reported that the lumbar facet injections provided insignificant pain relief. (R. 537).  On August 6, 2018, Plaintiff presented with severe pain in his coccyx upon sitting and noted that his neck pain had increased since his last visit. (R. 545).  In August and September 2018, Dr. Elbaz recommended epidural steroid and trigger point injections due to "lack of response to other conservative treatments." (R. 547, 551).

### 5.  Justin Boyd, PA-C

On January 18, 2018, Physician Assistant Justin Boyd ("PA Boyd")[6] completed a medical source statement. (R. 444-49).  PA Boyd noted that he had been treating Plaintiff monthly since September 29, 2016. (R. 444).  He listed Plaintiff's diagnoses as lumbar and cervical disc disorders with radiculopathy and spondylosis of the lumbar spine. (*Id*.).  PA Boyd characterized Plaintiff's neck pain as constant, sharp shooting pain that radiated to the hands and was aggravated by changes in weather and lifting objects, and Plaintiff's lower back pain as constant, sharp shooting pain to the legs, aggravated by walking, bending, standing and climbing steps. (*Id*.).  Plaintiff had reduced range of motion in his cervical and lumbar spine; sensory changes; impaired sleep; abnormal posture; tenderness; reduced grip strength; trigger points; muscle spasm; muscle weakness; and a positive straight leg raise test. (*Id*.).  PA Boyd assessed that Plaintiff constantly experienced pain severe enough to interfere with attention and concentration, and that Plaintiff had a marked limitation in his ability to deal with work stress. (R. 445).  He noted that the medications Plaintiff took had side effects of dizziness and constipation, which may have implications for working. (*Id*.).  PA Boyd indicated that in an eight-hour workday,

---

[6] Though the regulations were amended in 2017 to add physician assistants to the list of acceptable medical sources, these new regulations do not apply to Plaintiff's claims since he filed for disability benefits before March 27, 2017. *See* 20 C.F.R. § 404.1502(a)(8); *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("[P]hysicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.").

Plaintiff could sit for a total of three hours; stand or walk for a total of two to three hours

provided that he could sit or lie down/recline for fifteen-minute intervals; and needed to rest/lie

down for a total of two hours. (R. 446-47).  Plaintiff could lift or carry up to five pounds

frequently and up to ten pounds occasionally, and could never carry more than ten pounds. (R.

447).  Plaintiff could occasionally do the following: balance when standing/walking on level

terrain; move his neck in all directions; and handle and finger with both hands. (R. 447-48).

However, Plaintiff could never stoop, or reach with either hand. (*Id.*).  Plaintiff did not use an

assistive device. (R. 448).  PA Boyd assessed that Plaintiff would likely be absent more than

three times per month as a result of his impairments or treatment. (R. 449).

**6.  Diagnostic Records**

**i.  Lumbar Spine**

An MRI of Plaintiff's lumbar spine on November 18, 2013 revealed a "herniated disc at

L4-[L]5 with bilateral foraminal stenosis and right L4 nerve root impingement" as well as "grade

1 retrolisthesis at L5-S1." (R. 358).  Plaintiff had another MRI of his lumbar spine on June 1,

2015, which showed "[m]ultilevel disc desiccation and bulge[s]" that were "most pronounced" at

the L4-L5 level "where there is effacement of [the] ventral thecal sac but no significant central

stenosis." (R. 363-64).  There was also no focal herniated nucleus pulposus and the "bulge and

facet hypertrophy cause[d] mild-to-moderate multilevel neural foraminal stenosis, most

pronounced on the right at L4-L5." (*Id.*).  A third MRI on February 22, 2018 revealed

"[m]ultilevel lumbar spondylosis most pronounced as L4-[L]5"; a "small disc bulge and broad

based right disc protrusions" at L4-[L]5; "[m]oderate – severe right foraminal stenosis with

impingement of the exiting right L4 nerve root"; "[m]ild-moderate left foraminal narrowing";

"[m]ild canal narrowing with asymmetric stenosis of the right lateral recess"; a "small disc

bulge" and "[m]ild canal and mild bilateral foraminal narrowing" at L3-L4; "[m]ild facet

arthropathy at L3-L4, L4-L5, and L5-S1." (R. 458-59).  A CT scan of Plaintiff's lumbar spine on January 11, 2019 showed "[d]egenerative changes at L3-L4 through L5-S1" that resulted in "right greater than left neural foraminal stenosis" and "[n]o high-grade canal stenosis." (R. 846-47).

## ii.  Cervical Spine

Plaintiff received an MRI of his cervical spine on June 1, 2015, which revealed "straightening of lordosis, which could relate to spasm"; "[m]ultilevel disc desiccation and bulge[s] most pronounced at C4-C5 where it causes mild central stenosis"; no focal herniated nucleus pulposus; and "[r]ight greater than left mild-to-moderate neural foraminal stenosis from C3-C4 through C5-C6 because of uncovertebral and facet hypertrophy." (R. 360-61).  A second MRI on January 11, 2019 revealed "[m]ild multilevel degenerative changes on a background of mild congenital canal stenosis" that contributed to "moderate to severe spinal canal stenosis at C5-C6 without evidence of cord compression." (R. 848-49).

## iii.  Thoracic Spine

A June 5, 2015 MRI of Plaintiff's thoracic spine showed "[m]ild multilevel disc desiccation and bulge[s] [with] [n]o evidence of focal disc herniation, [or] central canal or neural foraminal stenosis." (R. 366).

## iii.  Pulmonary Function Testing

Plaintiff underwent pulmonary function testing on March 19, 2018, and the spirometry revealed no obstruction. (R. 735-36, 768).

## B.  Medical Evidence Relating to Plaintiff's Psychological Impairments

## 1.  Scott Schwartz, M.D.

From February 18, 2016 through August 13, 2018, Scott Schwartz, M.D. ("Dr. Schwartz"), a psychiatrist, treated Plaintiff for complaints of anxiety and depression, and

provided counseling and medication management. (R. 583, 593, 616-18, 630, 638-40, 645-47, 651-53, 666-68, 675-78, 703-05, 709-11, 714-17, 725, 750-53).  Dr. Schwartz continuously noted Plaintiff's agitation and anxiety around his mother's illness, her deterioration, and her impending death. (R. 616, 618, 630, 638).  Throughout treatment, Dr. Schwartz also indicated on numerous occasions that Plaintiff was depressed and/or sad, and his affect was constricted, mostly relating to his mother's condition and her deterioration. (R. 645-47, 651-53, 666, 668, 686-91, 703-11, 714-17).  Dr. Schwartz consistently commented that Plaintiff was cooperative; had goal-directed thought processes with normal perceptions; normal thought content and cognition; average intelligence; and normal attention/concentration, memory, insight and judgment. (R. 645, 651, 666, 676, 687, 689-90, 692, 703-04, 706-07, 709, 751-52).  In numerous visits, Plaintiff also denied sleep or appetite difficulties, paranoia, explosiveness, substance abuse, intrusive thoughts and panic/rage attacks. (R. 709, 717, 725, 739, 751).

On March 24, 2016, Dr. Schwartz wrote in a letter to the Office of Social Security that Plaintiff was under his care for Major Depression, Recurrent type, and Dependent Personality Disorder due to his "extreme passive dependence on his 86 year-old cancer-ridden mother." (R. 370).  Dr. Schwartz stated that Plaintiff "ha[d] never been able to function independently," and concluded that Plaintiff could not support himself financially or psychologically and was unable "to engage in any form of gainful activity." (*Id*.).  The records also noted that Plaintiff had severe lower back syndrome for which he received pain treatments. (*Id*.).

On April 21, 2016, Dr. Schwartz indicated that Plaintiff was without support systems, and that though Plaintiff was afraid, he showed strength and resolve with respect to caring for his dying mother. (R. 593).  From August 18 through October 13, 2016, Plaintiff's anxiety was high regarding his mother's illness and deterioration. (R. 618, 630, 638).  On October 13, 2016,

Plaintiff reported that his mother was placed on hospice care at home. (R. 638).  From November 10, 2016 through February 6, 2017, Plaintiff stated that he worked very hard to care for his mother, which sometimes made him feel frustrated and stuck in the role of caregiver. (R. 640, 645, 651, 666).  On December 8, 2016, Dr. Schwartz remarked that Plaintiff was "developing inertia," was on a high dose of Xanax, was very dependent, "live[d] in a fantasy-world of effectivity," and was "easily able to fall into a defenseless position." (R. 645, 647).  At his January 9, 2017 visit, Plaintiff was angry and anxious, and irritable about having to wait for the doctor, but was "in control in terms of his feelings." (R. 651).  On February 6, 2017, Dr. Schwartz noted that Plaintiff was "essentially status quo and in no major distress." (R. 666).  On April 6 and May 3, 2017, Plaintiff stated that though his mother was deteriorating rapidly, he had a new girlfriend who was helping him through the situation. (R. 686, 689).  On May 31, 2017, Dr. Schwartz noted that Plaintiff assumed total responsibility for his mother's care. (R. 693).  On October 5, 2017, Plaintiff said that he was upset because he had excruciating pain in his back and could not proceed with surgery because "his mother might not get food," and he felt "completely out of control of his life." (R. 714).  Plaintiff was also "a bit obsessed with HAVING to save his mother." (*Id.*).

Plaintiff's mother died on November 2, 2017, after which Plaintiff was sad, depressed, anxious, apathetic/detached and/or grieving across numerous subsequent visits, but also expressed feeling very supported by and grateful to Dr. Schwartz. (R. 717-18, 725, 750).  On December 28, 2017, Dr. Schwartz began to lower Plaintiff's alprazolam gradually and noted that Plaintiff was socializing. (R. 725).  On April 2, 2018, Plaintiff reported that he was doing better and "[m]et a nice new girl." (R. 739).  At a visit on May 16, 2018, Plaintiff indicated that he was doing well, getting engaged and very happy in his relationship, was past the mourning period,

and was in much better control. (R. 742).  However, on June 20, 2018, Plaintiff reported he was

still grieving for his mother and found his girlfriend to be "too pushy." (R. 750).  Though Dr.

Schwartz assessed no depression or anxiety, he noted that Plaintiff had "a sense of apathy and

detachment[;] he could manage with [his] mother but not with [his girlfriend]." (*Id*.).  Dr.

Schwartz opined on July 16, 2018 that Plaintiff was at baseline without depressive or anxious

symptoms. (R. 751).  On August 13, 2018, Dr. Schwartz assessed that Plaintiff was in good

control without any intrusive memories or fears and he decreased Plaintiff's alprazolam and the

frequency of his visits. (*Id*.).

**2.  Arlene Rupp-Goolnick, Ph.D. – Psychiatric Consultative Examination**

Plaintiff had a psychiatric consultative examination with Arlene Rupp-Goolnick, Ph.D.

("Dr. Rupp-Goolnick") on July 14, 2016. (R. 422-25).  Dr. Rupp-Goolnick observed that

Plaintiff was a fifty-one-year-old male who came alone to the evaluation. (R. 422).  Plaintiff

denied any prior psychiatric hospitalizations or outpatient treatment, but noted that he met with

Dr. Schwartz on a monthly basis for about one year. (*Id*.).  Plaintiff reported difficulty falling

asleep due to his pain and stated that he slept better with medication. (*Id*.).  He also had poor

appetite, weight loss, loss of usual interests, diminished sense of pleasure, sad moods, anxiety

about his mother's health, and some short-term memory deficits. (R. 422-23).  Plaintiff was not

able to do the following daily activities and required some help with them: putting on his

sneakers, carrying heavy things, performing heavy cleaning, doing laundry and shopping. (R.

424).  Dr. Rupp-Goolnick noted that Plaintiff's limitations in these areas were due to back and

neck pain rather than to psychiatric issues. (*Id*.).  Plaintiff was able to dress and bathe himself,

cook simple meals, manage money, drive short distances and take public transportation. (*Id*.).

He had friends who visited him and whom he visited, he was close with his mother and cousin,

and he spent the typical day watching television, visiting friends, reading and watching sports. (*Id.*).

A mental status examination revealed that Plaintiff was cooperative and had an adequate manner of relating; fair hygiene; normal motor behavior; appropriate eye contact; fluent speech; adequate expressive and receptive language; coherent and goal-directed thought processes; full range and appropriate affect; neutral mood; intact attention, concentration and memory; average cognitive functioning; good insight and judgment; and appropriate general fund of information relative to experience. (R. 423-24).  Plaintiff wore a back brace and his posture appeared slouched. (R. 423).  Dr. Rupp-Goolnick assessed that Plaintiff had no limitation in following and understanding simple directions and instructions; performing simple tasks; maintaining attention and concentration; learning new tasks; making appropriate decisions; or relating adequately with others. (R. 424).  Plaintiff had mild limitations due to pain in maintaining a regular schedule; performing complex tasks independently; and dealing appropriately with stress. (R. 424-25).  Dr. Rupp-Goolnick concluded that Plaintiff's psychiatric problems were not significant enough to interfere with his daily functioning, and diagnosed him with depressive disorder and generalized anxiety disorder. (R. 425).

### 3.  T. Harding, Ph.D. – State Agency Psychological Consultant

T. Harding, Ph.D. ("Dr. Harding") reviewed Plaintiff's record on August 16, 2016. (R. 116-120).  Dr. Harding found no history of repeated episodes of decompensation and assessed mild restrictions in performing activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace. (R. 120).  Dr. Harding concluded that Plaintiff's psychiatric impairment was non-severe. (R. 119-20).

**C.  Non-Medical Evidence**

**1.  Function Report Completed by Denise Pettway on Plaintiff's Behalf**

On April 25, 2016, Plaintiff's case manager, Denise Pettway, completed a function report on Plaintiff's behalf. (R. 295-302).  Ms. Pettway reported that Plaintiff took care of his mother, prepared his own meals daily, did light household chores, used public transportation, did grocery shopping in stores, watched television, read, attended HRA-mandated medical appointments, and was able to pay his bills and count change. (R. 295-99).  Ms. Pettway indicated that Plaintiff followed written and spoken instructions well and did not have difficulty paying attention. (R. 300).  While Ms. Pettway noted that Plaintiff did not have any problems getting along with family, friends, neighbors or others, he reported that his ailments severely limited his participation in family functions and that he did not spend time with others. (R. 299-300).  She reported that Plaintiff's conditions impacted his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs and complete tasks, and stated that he needed between five minutes to one hour of rest before he could resume walking. (R. 300).  Plaintiff also suffered from pain in his back when he bent down in the shower. (R. 296).

**2.  Plaintiff's Testimony**

Jacques Farhi, Esq. represented Plaintiff at his hearing on December 6, 2018. (R. 71-113).  Plaintiff testified that he was fifty-four years old and dropped out of school in the ninth grade. (R. 74-75).  Plaintiff explained that he received a gunshot wound to his right arm as a child, which required a plate and six screws to repair. (R. 75, 110).  As a result, his arm still bothers him and "sometimes get[s] stuck… if [he] grabs something." (*Id.*).  Plaintiff testified that he could not work because of his back pain. (R. 80).  The pain made it difficult to sleep and he could not bend down. (*Id.*).  He described the pain as a ten out of ten and said that it caused him to cry daily. (R. 93).  Plaintiff reported that he took care of his terminally ill mother for three

years before she passed away the previous year. (R. 79).  He did "most of the things" for her even though she had a home health aide. (R. 88).  He testified that he "took care of [his] mother [him]self" and "made sure [his] mother was all right." (R. 88).  He reported that since her passing, he spent his days at home watching television and had no social life. (R. 79).  Plaintiff also testified that he did laundry in his building a little at a time due to back pain, did grocery shopping sometimes, and cooked a "little bit here and there," but mostly ate out. (R. 79-80).  He occasionally drove to appointments. (R. 88).  He also testified that he could not stand for very long; could sit for twenty to thirty minutes at one time without his back getting numb; and could walk less than one block at a time. (R. 87).

Plaintiff also stated that he had asthma and used an inhaler daily. (R. 89).  He said that he was hospitalized in 2006 because of his asthma. (*Id.*).  Plaintiff also had a hernia that prevented him from doing physical activities. (R. 90-91).

Plaintiff testified that he was taking twelve medications, which made his "thought process [] not really good," and caused constipation, headaches, sleepiness and dizziness. (R. 84, 91).  He also wore a back brace and a big weight belt and had used a transcutaneous electrical nerve stimulation ("TENS") machine for his pain. (R. 80, 82).  However, none of this resolved his pain. (*Id.*).  Plaintiff also received treatment in the form of epidural and steroid injections. (R. 86-87).  Surgery was recommended in 2014 but Plaintiff had not been evaluated by a surgeon since then; he did, however, have an upcoming appointment scheduled. (R. 80-81, 92).  He explained that he did not have surgery because he was taking care of his mother at the time and was scared to leave her home by herself. (R. 92).  He also said he was afraid that something could go wrong in surgery. (*Id.*).

### 3. Vocational Expert Testimony

Kendrall Pittman, a vocational expert ("VE"), testified at Plaintiff's hearing. (R. 94-109).

The ALJ acknowledged that Plaintiff had no past relevant work. (R. 97).  The ALJ then posed a hypothetical to VE Pittman, asking him to consider an individual of Plaintiff's age, education and work background who could perform light work with the following limitations: he could occasionally push, pull, operate foot controls, and climb ramps or stairs, but generally no more than a few steps, rarely full flights; never climb ladders, ropes or scaffolds; occasionally balance or stoop; never kneel, crouch or crawl; frequently reach; occasionally reach overhead; frequently handle or finger; must avoid concentrated exposure to extreme temperatures and  pulmonary irritants, such as fumes, odors, dust or gases. (R. 97).  VE Pittman testified that such an individual could work as a marker, a non-postal mail clerk, or a router, all of which were light, unskilled jobs with a Specific Vocational Preparation ("SVP") of 2. (R. 97-98).  These jobs also all had a sit stand option and could be done in either position. (R. 101).  VE Pittman stated that if the hypothetical individual was further restricted to simple, routine work and low-stress jobs, defined as only occasional decision-making and occasional changes in the work setting, he could still do these jobs. (R. 98).  If the person was also limited to no conveyor belt work, no stooping, and only occasional interaction with the public or coworkers, VE Pittman said he could still do these jobs. (R. 98-99).  The ALJ then asked VE Pittman to consider an individual who was limited to sedentary jobs with all the previous limitations, and VE Pittman testified that such an individual could work as an addresser, document preparer, or charge account clerk, all of which were unskilled jobs with an SVP of 2. (R. 99-100).

Attorney Farhi then posed a hypothetical to VE Pittman, including the additional limitation that this individual would be off task 10% to 40% of the time, and VE Pittman testified that if an individual is off task 15% or more, he is likely to be terminated. (R. 103).  VE Pittman also testified in response to Attorney Farhi's additional hypothetical, that an individual who

could not reach at all with either hand could not perform the light jobs. (R. 103-04).  An individual who could only sit for three hours a day and stand and walk for a total of between two and three hours also could not do any of the light jobs. (R. 104).  VE Pittman stated that an individual who would be absent more than three times a month could not do any of these jobs either. (*Id.*).

## D.  The ALJ's and Appeals Council's Decisions

ALJ Loewy applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 404.920(a). (R. 29-38).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from his application date, April 25, 2016. (R. 29).  At step two, the ALJ determined that Plaintiff had the following severe impairments: (1) degenerative disc disease, (2) asthma, (3) obesity, (4) depression, and (5) anxiety. (*Id.*).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 404.925 and 404.926). (R. 29-30).

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.967(b) with the following restrictions: occasionally push/pull, and occasionally operate foot controls; occasionally climb ramps and stairs, but generally just a few steps, rarely full flights; never climb ladders, ropes or scaffolds; occasionally balance or stoop; never kneel, crouch or crawl; occasionally reach overhead; frequently reach in all other directions; frequently perform handling and fingering; and must avoid concentrated exposure to extreme temperatures and pulmonary irritants such as odors, fumes, dust or gases. (R. 31).  In addition, Plaintiff was limited to performing simple, routine

work at a low-stress job, defined as requiring only occasional decision-making, involving only occasional changes in the work setting, and performing no conveyor belt work. He was further limited to only occasional interaction with the public and coworkers. (*Id.*).

In arriving at the RFC, the ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record. (*Id.*).  The ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 33).  The ALJ reviewed the opinion evidence in the record, granting "great weight" to Dr. McLean Long's opinion; "partial weight" to Dr. Rupp-Goolnick's opinion; "little weight" to the opinions of Drs. Boyd, Harding and Schwartz; and "no weight" to Denise Pettway's opinion. (R. 35-36).

At step four, the ALJ determined that Plaintiff had no past relevant work. (R. 37).  However, the ALJ determined that considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, namely marker, mail clerk, and router. (R. 37-38).  The ALJ thereafter concluded that Plaintiff was not disabled under the Social Security Act at any time since April 25, 2016. (R. 38).

On December 20, 2020, the Appeals Council, through Administrative Appeals Judges Patricia Hawkins and Laura Middleton, adopted the ALJ's findings of fact and legal conclusions for steps one to four, but at step five, determined that Plaintiff was disabled as of July 30, 2019. (R. 7-11).  In so doing, the Appeals Council considered Plaintiff's limited RFC, limited education and lack of relevant work and determined that as of July 30, 2019, when Plaintiff was

within three months of his fifty-fifth birthday, the higher age category of "advanced age" was applicable and that his vocational factors met the requirements of a special profile. (R. 9).  The Appeals Council thus applied Medical-Vocational Rule 202.01 to find the claimant disabled as of July 30, 2019, but adopted the ALJ's determination that Plaintiff was not disabled before that date. (*Id*.).

## II.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further administrative proceedings because the ALJ improperly determined that Plaintiff had the RFC to perform light work rather than sedentary work.[7] (Pl. Br. at 18).  Plaintiff contends that the ALJ failed to properly consider the assessment of Plaintiff's treating physician assistant and improperly gave great weight to Dr. McLean Long's opinion, (*id*. at 19-24); failed to consider Plaintiff's monthly absences, (*id*. at 25); did not properly consider the paragraph B criteria of listings 12.04 or 12.06, (*id*. at 25-26); and failed to properly evaluate Plaintiff's subjective statements, (*id*. at 26-28).  Plaintiff also argues that the ALJ erred in not requesting an updated consultative examination since the ALJ did not render her decision until three years after Dr. McLean Long's assessment and Plaintiff's condition deteriorated over time. (*Id*. at 23; Pl. Reply Br. at 2-4).  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's RFC determination and specifically, that in reaching the RFC, the ALJ properly evaluated Plaintiff's subjective complaints, (Comm'r Br. at 17-20), and the opinion evidence, (*id*. at 20-25).  Further, the Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff was able to perform work that exists in

---

[7] Given that the ALJ determined that Plaintiff was an individual closely approaching advanced age with limited education and no past relevant work, (R. 37), if the ALJ had limited Plaintiff to sedentary work, then Plaintiff would have been found disabled. 20 C.F.R. Appendix 2 to Subpart P of Part 404 § 201.09.

the national economy. (*Id*. at 25-26).

## A. Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. §

405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting

*Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way,

a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting

*Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very deferential"

to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's

or "determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692

F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501

(2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have

affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty

to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748

F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is

grounds for reversal." *Id.*

## B.  ALJ's Duty to Develop the Record

Initially, the Court must be satisfied that the record is fully developed before determining

whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*,

19-CV-1539(AT)(JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ

has satisfied this duty to develop the record is a threshold question.").  "[I]n light of the

'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial,

has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08-Civ-1525(LAP)(GWG),

2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "This duty is present even when a claimant is represented by counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004).  "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013).

Here, the Court finds that there are no obvious gaps in the record.  The record consists of extensive medical records from MLK Wellness Center, (R. 375, 380-81, 391, 568-72, 593-99, 619-26, 632-34, 641-44, 726-28, 731-32, 736-37), Dr. Elbaz, (R. 467-552), and Dr. Schwartz (R. 583, 593, 616-18, 630, 638-40, 645-47, 651-53, 666-68, 675-78, 703-05, 709-11, 714-17, 725, 750-53); numerous diagnostic records, (R. 358, 360-61, 363-64, 366, 458-59, 735-36, 768, 846-49); medical opinions from two consultative examiners, (R. 422-25, 427-31), a state agency consultant, (R. 116-20), and Plaintiff's treating physician assistant, (R. 444-49); a form from Dr. Esposito, (R. 371); Plaintiff's testimony, (R. 71-113); and a function report completed by Plaintiff's case manager on Plaintiff's behalf, (R. 295-302).  Moreover, at the hearing, Plaintiff's attorney did not have any objections to the evidence, other than initially alerting the ALJ that one of the exhibits was incomplete and that he had the missing page, but then correcting himself that the record already contained it. (R. 72-74, 110). *See David B. C. v. Comm'r of Soc. Sec.*, 1:20-CV-01136(FJS)(TWD), 2021 WL 5769567, at *7 (N.D.N.Y. Dec. 6, 2021) (finding that the ALJ fulfilled her duty to develop the record where "Plaintiff did not object to the contents of the

record or identify any gaps that need to be filled.").  The ALJ also alerted Plaintiff's counsel at

the hearing that records from Dr. Sady Ribeiro, a pain management doctor at New York Surgery

Center Queens, were missing, (R. 111), but those records were subsequently added to the file,

(R. 770-844).  Accordingly, the ALJ fulfilled her duty to develop the record.

## C.  The ALJ's RFC Assessment

The RFC is an "individual's maximum remaining ability to do sustained work activities

in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52

(2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2).  The RFC determination is

reserved to the Commissioner. *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017).

When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities,

[and] symptomatology, including pain and other limitations that could interfere with work

activities on a regular and continuing basis." *Weather v. Astrue*, 32 F. Supp. 3d 363, 376

(N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)).  Nevertheless, ALJs are not medical

professionals. *See Heather R. v. Comm'r of Soc. Sec.*, 1:19-CV-01555(EAW), 2021 WL 671601,

at *3 (W.D.N.Y. Feb. 22, 2021).  Therefore, the ALJ must refrain "from 'playing doctor' in the

sense that '[he] may not substitute his own judgment for competent medical opinion.'" *Quinto v.

Berryhill*, No. 3:17-cv-00024(JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (internal

citations omitted).  Accordingly, where the record shows that the claimant has more than "minor

physical impairments," *Jaeger-Feathers v. Berryhill*, 1:17-CV-06350(JJM), 2019 WL 666949, at

*4 (W.D.N.Y. Feb. 19, 2019), an ALJ is not qualified "to assess residual functional capacity on

the basis of bare medical findings," *Kinslow v. Colvin*, No. 5:12-cv-1541(GLS/ESH), 2014 WL

788793, at *5 (N.D.N.Y. Feb. 24, 2014).

### 1. Weighing the Opinion Evidence

### i.       Treating Physician Rule[8]

Plaintiff asserts that the ALJ failed to properly consider the assessment of his treating

physician assistant, PA Boyd, which he claims was supported by the medical records, diagnostic

tests and Dr. McClean Long's assessment, and should have been given great weight because of

PA Boyd's longstanding treating relationship with Plaintiff. (Pl. Br. at 19-24).  He also claims

that it was improper for the ALJ to give "great weight" to the opinion of Dr. McLean Long, the

internal medicine consultative examiner, because it was based on a one-time examination. (*Id*. at

23-24).  The Commissioner contends that the ALJ properly considered the opinion evidence in

arriving at the RFC, reasonably affording great weight to Dr. McLean Long's opinion and

properly giving little weight to PA Boyd's opinion. (Comm'r Br. at 20-25).

In determining whether a claimant is disabled, an ALJ must give the medical opinion of a

treating physician "controlling weight if it is well supported by medical findings and not

inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78-79.  This is because the

treating physician is in a more capable position to provide a detailed picture of a claimant's

impairments than consultative physicians who may see the claimant on just one occasion or not

at all. *See Estela-Rivera v. Colvin*, No. 13-CV-5060(PKC), 2015 WL 5008250, at *13 (E.D.N.Y.

Aug. 20, 2015) (citing 20 C.F.R. § 404.1527(d)(2)).  An ALJ may properly disregard the opinion

of a treating physician where the opinion is contradicted by the weight of other record evidence,

*Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), or if it is internally inconsistent or otherwise

uninformative, *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Micheli v.*

---

[8] Despite recent changes in the regulations, the treating physician rule applies to claims filed before March 27, 2017. *Quiles v. Saul*, 19-CV-11181(KNF), 2021 WL 848197, at *9 (S.D.N.Y. Mar. 5, 2021) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).  Plaintiff filed his claim on April 25, 2016, (R. 253-73), so the treating physician rule applies here.

*Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (summary order) ("A physician's opinions are given

less weight when his opinions are internally inconsistent.").

Where the ALJ affords limited weight to the treating source's opinion and more weight to

a non-treating source's opinion, he or she must provide "good reasons" for doing so. *Schaal*, 134

F.3d at 505; *see also* 20 C.F.R. § 404.1527(c)(2).  In addition, the ALJ must follow "specific

procedures . . . in determining the appropriate weight to assign" the treating source's opinion.

*Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  The ALJ must "explicitly consider the

following, nonexclusive *Burgess* factors: (1) the frequen[cy], length, nature, and extent of

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the

opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

at 95-96 (quoting *Selian*, 708 F.3d at 418) (per curium) (citing *Burgess*, 537 F.3d at 129)

(internal quotation marks omitted). "An ALJ's failure to 'explicitly' apply the *Burgess* factors

when assigning weight at step two is a procedural error." *Id.* at 96.  Where an ALJ procedurally

errs, "the question becomes whether a searching review of the record . . . assure[s] [the court] . . .

that the substance of the [treating physician] rule was not traversed." *Id.* (quoting *Halloran*, 362

F.3d at 32) (internal quotation marks omitted).  Remand is appropriate "when the Commissioner

has not provided 'good reasons' for the weight given to a treating physician[']s opinion."

*Halloran*, 362 F.3d at 33.

Here, the ALJ gave "little weight" to the opinion of Plaintiff's treating provider, PA

Boyd, in part because it was from "an unacceptable medical source." (R. 36).  The ALJ correctly

noted that as a physician assistant, PA Boyd was not an acceptable medical source. *See* 20 C.F.R.

§ 416.913(a), 20 C.F.R. § 416.913(d)(1).  Thus, his opinion was not entitled to controlling

weight or to "the same deference as those of a treating physician." *See Genier*, 298 F. App'x at

108 (citing SSR 06–3p) ("According to Social Security Ruling 06–3p, 'only acceptable medical sources can be considered treating sources ... whose medical opinions may be entitled to controlling weight'…physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.").  Accordingly, the treating physician rule does not apply to PA Boyd's opinion.

Even though PA Boyd's opinion is not entitled to controlling weight, "sources not technically deemed 'acceptable medical sources' are important in the medical evaluation because they have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Williams v. Colvin*, 15-cv-4173(ALC), 2016 WL 3034494, at *9 (S.D.N.Y. May 26, 2016) (internal quotation marks and citation omitted).  "This is particularly so where the physician's assistant had a 'lengthy treatment relationship' with the claimant." *Id*.  Here, PA Boyd treated Plaintiff monthly from September 29, 2016 to January 18, 2018. (R. 444).  Their lengthy treating relationship merited the ALJ's consideration of PA Boyd's opinion in reaching her RFC.

Here, the ALJ did consider PA Boyd's opinion in reaching the RFC, and determined that it should be accorded little weight because it was more restrictive than other evidence in the record. (R. 36).  Though the ALJ did not specify which other evidence was less restrictive than PA Boyd's opinion, the Court's review of the record supports this determination.  For example, while PA Boyd restricted Plaintiff to occasionally handling and fingering and never reaching, (R. 447-48), other opinions and treatment notes in the record did not include or support any such restrictions.  In fact, Dr. McLean Long assessed that Plaintiff had intact hand and finger dexterity and full strength in his hand grip. (R. 430).  It is for the ALJ, not this Court, to "weigh [this]

conflicting evidence" in the record. *Campos ex rel. Cruz v. Barnhart*, No. 01-Civ-10005(SAS), 2003 WL 21243036, at *6 (S.D.N.Y. May 28, 2003).  Thus, the ALJ properly weighed PA Boyd's opinion.

      Plaintiff also takes issue with the fact that the ALJ assigned "great weight" to the opinion of consultative examiner Dr. McLean Long. (Pl. Br. at 23-24).  However, it is "well-settled" that a one-time opinion, like that of a consultative examiner, "may be given great weight and may constitute substantial evidence to support a decision." *Oleske v. Berryhill*, 18-CV-74(JLS), 2020 WL 1643860, at *4 (W.D.N.Y. Apr. 2, 2020); *see also Poole v. Saul*, 462 F. Supp. 3d 137, 156 (D. Conn. 2020).  The ALJ reasoned that Dr. McLean Long's opinion was "supported by the objective and treating evidence of record, which demonstrates lumbar and cervical spine and asthma impairments with persistent symptoms despite treatment" and "considers the claimant's subjective complaints and self-reported retained physical capacity for tasks such as activities of daily living despite his severe musculoskeletal and respiratory impairments." (R. 36).  Further, Dr. McLean Long's determination that Plaintiff had mild and moderate limitations does not prohibit an RFC for light work. *See, e.g.*, *White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (Moderate limitations in standing, sitting, and performing other activities did not indicate that a reasonable factfinder would have to conclude that Plaintiff lacked the ability to perform light work.); *see also Gurney v. Colvin*, 14-CV-688S, 2016 WL 805405, at *3 (W.D.N.Y. Mar. 2, 2016) ("[M]oderate limitations…are frequently found to be consistent with an RFC for a full range of light work.").  Consequently, the ALJ's assessment of Dr. McLean Long's opinion was adequate and is not a basis for remand.

### i. Whether Dr. McLean Long's Opinion was Stale

      Plaintiff also argues that the ALJ should have requested an updated consultative examination since the ALJ did not render her decision until three years after Dr. McLean Long's

assessment and Plaintiff's condition deteriorated over time, making Dr. McLean Long's opinion stale. (Pl. Br. at 23; Pl. Reply Br. at 2-4).  The Commissioner does not address this argument. (*See* Comm'r. Br.).

"[A]n ALJ should not rely on stale opinions – that is, opinions rendered before some significant development in the claimant's medical history, … [and] medical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ's finding." *Billy B. v. Comm'r of Soc. Sec.*, 20-CV-0036(MWP), 2021 WL 3191882, at *4 (W.D.N.Y. July 28, 2021) (internal citations and quotations omitted).  "The . . . passage of time does not render an opinion stale[;] [i]nstead, a medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated." *Whitehurst v. Berryhill*, 1:16-cv-01005(MAT), 2018 WL 3868721, *4 (W.D.N.Y. Aug. 14, 2018).  "The mere diagnosis of additional impairments[] . . . [also] does not render [an] opinion stale" absent "evidence of accompanying additional limitations." *Deborah Elaine L. v. Comm'r of Soc. Sec.*, 6:20-CV-06607(EAW), 2022 WL 2662974, at *4 (W.D.N.Y. July 11, 2022); *see also Hernandez v. Colvin*, 15-CV-6764(CJS), 2017 WL 2224197, at *9 (W.D.N.Y. May 22, 2017) ("[A] medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the provider]'s conclusions.").  "A more remote medical opinion may in fact constitute substantial evidence if it is consistent with the record as a whole." *Marozzi v. Berryhill*, 6:17-cv-06864(MAT), 2019 WL 497629, at *7 (W.D.N.Y. Feb. 8, 2019).

Here, Plaintiff reported to Dr. Elbaz numerous times in 2017 and 2018 that he felt his back and neck pain were worsening. (R. 479-80, 482, 496, 517, 521, 533-36, 545).  However, Plaintiff "neither points to any medical evidence suggesting that after th[e] opinion[] w[as]

rendered his condition deteriorated causing disabling functional limitations, nor identifies any relevant evidence post-dating the medical opinion[] that the ALJ failed to consider." *Sanchez v. Comm'r of Soc. Sec.*, 19-CV-0408(MWP), 2020 WL 5107568, at *9 (W.D.N.Y. Aug. 31, 2020). The case that Plaintiff cites in support of his proposition, *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642 (2d Cir. 2020), is easily distinguishable. (*See* Pl. Br. at 23; Pl. Reply Br. at 4). In *Blash*, the plaintiff was hospitalized, after which "she could no longer lift weights or walk long distances, [] was limited in carrying out activities of daily living," and "needed assistance with bathing, dressing her lower body, toileting, meal preparation, shopping, and housework." *Id*. at 644. However, here, Plaintiff did not suffer a major medical event like hospitalization that limited his functional abilities. Despite his self-reported observations of worsening pain, medical records from Dr. Elbaz and PA Boyd, who saw Plaintiff continuously between September 2016 and September 2018 and after Dr. McLean Long's consultative examination was rendered, revealed similar rather than worsening functional limitations throughout this time. (*See* R. 467-552). In fact, these records consistently indicate that Plaintiff had 4/5 muscle pain, decreased ranges of motion, paraspinal tenderness, and positive straight leg raise tests, as well as radiculopathy. (R. 467, 471, 475, 477, 479, 483, 485, 487, 489, 491, 493, 495, 499, 506, 518, 522, 534, 537-39, 542-43, 546-47, 550-51). These records also do not reflect worsening functional limitations, consistently remarking in the same terms that Plaintiff's back pain was aggravated by sitting, standing and walking. (R. 444, 474, 476, 484, 487, 494, 500, 504, 517, 521, 525, 529, 533, 537, 541, 545, 549). PA Boyd's opinion, rendered in 2018, does not indicate that Plaintiff's functional abilities worsened or that his condition deteriorated. (R. 444-49). Absent any significant developments in Plaintiff's medical history indicating worsening conditions, Plaintiff has not shown that Dr. McLean Long's opinion is stale warranting further

factual development. *See Ambrose-Lounsbury v. Saul*, 18-CV-240, 2019 WL 3859011, at *3-*4 (W.D.N.Y. Aug. 16, 2019).

## 2.  Sit-Stand Option

Plaintiff argues that the RFC failed to incorporate Dr. McLean Long's finding that Plaintiff had mild to moderate limitations in his ability to sit, stand and walk, as well as the extensive medical records that note that Plaintiff's pain was exacerbated by prolonged sitting, walking and standing. (Pl. Br. at 24).  The Commissioner does not address this argument. (*See* Comm'r Br.).

"When the record indicates that a claimant has significant limitations with regard to [his] ability to sit for extended periods of time, the ALJ should engage in a detailed discussion concerning the claimant's restrictions… and the RFC must be specific as to the frequency of the individual's need to alternate sitting and standing." *Kimberly M. v. Comm'r of Soc. Sec.*, 19-CV-1546(LJV), 2020 WL 6947346, at *3 (W.D.N.Y. Nov. 25, 2020) (internal quotation marks and citations omitted).  "That is because a claimant's need to alternate among sitting, standing, and walking 'may erode the occupational base'—for example, by making even sedentary or light work impossible to perform." *Linda H. v. Comm'r of Soc. Sec.*, 19-CV-1244(LJV), 2021 WL 2075437, at *3 (W.D.N.Y. May 24, 2021).

Here, the ALJ failed to include any limitation in the RFC regarding Plaintiff's ability to sit and stand, or his need to alternate between the two, despite evidence in the record that Plaintiff's back impairments impacted his ability to sit and stand for extended periods of time. (R. 31).  For instance, in physical therapy sessions with PT Roxas, Plaintiff reported being able to sit or stand for only fifteen minutes at a time and having difficulty transferring from sitting to standing. (R. 595).  Plaintiff also testified at his hearing that he could not stand for very long and could sit for only twenty to thirty minutes at one time without his back getting numb, which the

ALJ acknowledged in her decision. (R. 32, 87).  Further, PA Boyd indicated that in an eight-hour workday, Plaintiff could sit for a total of three hours; stand or walk for a total of two to three hours provided that he could sit or lie down/recline for fifteen-minute intervals; and needed to rest/lie down for a total of two hours. (R. 446-47).  In the consultative examination with Dr. McLean Long, Plaintiff stated that he could sit and stand for one to two minutes at a time each, which led Dr. McLean Long to assess mild to moderate limitations in Plaintiff's ability to sit and stand. (R. 33, 36, 427, 431).  Though the ALJ noted Dr. McLean Long's findings on this issue and gave her opinion "great weight," the ALJ failed to explain why she rejected Dr. McLean Long's sit-stand limitations in formulating the RFC.  While Dr. Aponte noted that in two visits in 2016, Plaintiff easily transferred from sitting to standing positions, (R. 634, 643), which the ALJ mentioned in her decision, (R. 35), those visits were early in the relevant period and subsequent, longitudinal medical records from Dr. Elbaz and PA Boyd consistently noted that Plaintiff's back pain was aggravated by sitting or standing for prolonged periods of time. (R. 444, 474, 476, 484, 487, 494, 500, 504, 517, 521, 525, 529, 533, 537, 541, 545, 549).  Accordingly, this matter is remanded so that the ALJ can properly consider Plaintiff's ability to sit and stand in the RFC.

### 3.  Plaintiff's Monthly Absences

Plaintiff argues that the ALJ erred in failing to consider the number of absences that Plaintiff would have as a result of his impairments or treatments and failed to take into account the VE's testimony that if a person were absent more than three times a month, they would not be able to perform the jobs identified by the VE. (Pl. Br. at 25).  The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff did not need to be absent more than three times per month, and the hypothetical to the VE mirrored the RFC determination that was supported by substantial evidence. (Comm. Br. at 26).

Although PA Boyd opined that Plaintiff needed to be absent more than three times a month, (R. 449), the ALJ reasonably gave his opinion little weight, (R. 36). Dr. Boyd's opinion regarding Plaintiff's required absences appears on a fill-in-the-blank form on which he checked off a box labeled "more than three times per month." (R. 449). Such a form response that lacks any explanation as to how PA Boyd reached this conclusion is "not particularly persuasive" and "of little value to the ALJ." *Dunne v. Comm'r of Soc. Sec.*, 349 F. Supp. 3d 250, 263 (W.D.N.Y. 2018); *see also James D. v. Comm'r of Soc. Sec.*, 547 F. Supp. 3d 279, 287 (W.D.N.Y. 2021). Additionally, nothing else in the record supports PA Boyd's specific limitation for Plaintiff being absent more than three times a month. In evaluating whether a plaintiff needs to be absent from work, courts have also considered opinions regarding a plaintiff's ability to maintain regular attendance or a regular schedule, be punctual, and maintain attention and concentration. *See, e.g.*, *Brush v. Berryhill*, 294 F. Supp. 3d 241, 266 (S.D.N.Y. 2018) (finding that evidence that plaintiff maintained attention, concentration and a regular schedule contradicted a medical opinion that plaintiff needed to be absent two to four times per month); *see also James D.*, 547 F. Supp. 3d at 287-88 ("The lack of any supporting explanation [about Plaintiff's need to be absent from work] is particularly problematic in [the opinion of plaintiff's neurologist], given that he also opined that Plaintiff could maintain regular attendance and be punctual within customary, usually strict tolerances."). Here, treatment records and other opinions noted Plaintiff's ability to maintain attention, concentration and a regular schedule. For example, across numerous visits, Dr. Schwartz remarked that Plaintiff had goal-directed thought processes with normal perceptions; normal thought content and cognition; and normal attention/concentration, memory, insight, and judgment, and did not mention any limitation regarding his ability to keep a schedule. (R. 645, 651, 666, 676, 687, 689-90, 692, 703-04, 706-07, 709, 751-52). Dr. Rupp-Goolnick assessed

that Plaintiff had a mild limitation in maintaining a schedule, (R. 424-25), and the ALJ gave her opinion "partial weight," (R. 36).  However, courts have held that even moderate limitations in maintaining a schedule can be accounted for by limiting Plaintiff's RFC to simple, routine, low-stress work with only occasional interaction with the public and coworkers and occasional changes in the work setting, as was done here. *See Uplinger v. Berryhill*, 18-CV-481(HKS), 2019 WL 4673437, at *7 (W.D.N.Y. Sept. 25, 2019) (collecting cases) ("[T]he ALJ appropriately incorporated…moderate limitations in maintaining a schedule into plaintiff's RFC by limiting plaintiff to work in a low stress work environment reflected by simple instructions and tasks, … and minimal changes in work routine and processes and limiting her to frequent interaction with supervisors and occasional interaction with coworkers and the general public."). Thus, the ALJ's RFC properly accounted for any limitations in Plaintiff's ability to keep a regular schedule and she gave adequate reasons for not crediting PA Boyd's opinion that Plaintiff would be absent more than three times per month.  Because the decision not to include a restriction regarding absences in the RFC is supported by substantial evidence, the ALJ was not required to incorporate such a limitation in the hypothetical to the VE, nor was she required to consider the VE's testimony that if a person was absent more than three times a month, that person would not be able to perform the jobs identified by the VE.  Accordingly, remand is not warranted on this ground.

However, since the Court determined that there are other deficiencies in the ALJ's RFC analysis that warrant remand, the hypothetical based on that RFC was also improper and thus, remand is warranted. *See Munnings-Bah v. Saul*, 19-Civ.-3510(LJL)(RWL), 2020 WL 5755065, at *21 (S.D.N.Y. Sept. 14, 2020), *report and recommendation adopted sub nom. Bah v. Comm'r of Soc. Sec.*, 2020 WL 5880182 (S.D.N.Y. Oct. 2, 2020) ("[W]hen an RFC determination is not

supported by substantial evidence, a hypothetical based on that RFC is not proper and warrants remand."); *see also McClinton v. Colvin*, No. 13-cv-8904(CM)(MHD), 2015 WL 6117633, at *33 (S.D.N.Y. Oct. 16, 2015) ("[W]hen a remand is already necessary to properly determine the plaintiff's RFC, the vocational-capacity finding must also be remanded when it was based on the testimony of a VE answering a similarly flawed hypothetical.").  Thus, on remand, the ALJ must reevaluate Plaintiff's vocational capacity after reassessing Plaintiff's RFC.

### 4.  Paragraph B Criteria of Listings 12.04 or 12.06

Plaintiff contends that the ALJ did not properly consider the paragraph B criteria of listings 12.04 or 12.06, particularly that the RFC failed to incorporate the moderate limitations in maintaining concentration, persistence or pace identified in the psychiatric techniques at steps two and three. (Pl. Br. at 25-26).  The Commissioner argues that the step two/three determination is separate from the RFC assessment and that the RFC's restriction to simple, routine tasks at a low-stress job sufficiently accommodated moderate limitations in concentration, persistence or pace. (Comm. Br. at 23-24).

The ALJ found at step two that Plaintiff's mental impairments, namely depressive and anxiety disorders, were severe but at step three determined that they did not meet either Listing 12.04 for depressive, bipolar and related disorders, or Listing 12.06 for anxiety and obsessive-compulsive disorders. (R. 29-31).  Assessing the paragraph B criteria, the ALJ noted that Plaintiff had a moderate limitation in concentrating, persisting or maintaining pace. (*Id*.).  Plaintiff argues that the ALJ's RFC should have explicitly incorporated Plaintiff's moderate limitations in concentrating, persisting or maintaining pace. (Pl. Br. at 26).

First, it was not legal error for the ALJ to find that Plaintiff had a severe limitation in Step Two and then not explicitly incorporate it in her RFC assessment.  "[A]n ALJ's decision is not necessarily internally inconsistent when an impairment found to be severe is ultimately found

not disabling: the standard for a finding of severity under Step Two of the sequential analysis is de minimis and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151; *see also Reeves v. Comm'r of Soc. Sec.*, 19-CV-775S, 2020 WL 4696589, at *3 (W.D.N.Y. Aug. 13, 2020) ("[T]he special technique used at steps two and three… is not an RFC assessment at step four. The ALJ may take the same information finding a moderate limitation for 'paragraph B' criteria and conclude that Plaintiff's functional capacity is not impaired by that moderate limitation.").

Further, in the RFC, the ALJ limited Plaintiff to "simple, routine work at a low-stress job, defined as requiring only occasional decision-making and involving only occasional changes in the work setting." (R. 31). This restriction sufficiently accounted for the moderate limitation in concentrating, persisting or maintaining pace that the ALJ assessed at step two. *See McIntyre*, 758 F.3d at 151-52 (finding that a limitation to "simple, routine, low stress tasks" was consistent with plaintiff's moderate limitations in maintaining concentration, persistence and pace); *see also Ana H. v. Comm'r of Soc. Sec.*, 1:19-cv-432(DB), 2020 WL 6875252, at *10 (W.D.N.Y. Nov. 23, 2020) ("[T]he ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, and pace by limiting her to simple, routine, and repetitive tasks and simple work-related decisions."); *see also Tana S. v. Berryhill*, 1:17-CV-0414(CFH), 2018 WL 4011560, at *7 (N.D.N.Y. Aug. 22, 2018) (holding that "substantial evidence demonstrates that Plaintiff can engage in 'simple, routine tasks such as those demanded of SVP 2 jobs or less' notwithstanding her physical impairments including … her moderate limitation in concentration, persistence, and pace.").

Plaintiff's reliance on *Munnings-Bah* and *Herren*, (Pl. Br. at 26), is misplaced.[9]  In

*Munnings-Bah*, the court based its decision to remand on the ALJ's lack of "narrative

discussion" regarding the impact of plaintiff's mental limitations on her work-related functions,

which consisted of one sentence, and also on the ALJ's failure to limit plaintiff to unskilled

work. *Munnings-Bah*, 2020 WL 5755065, at *19-20.  In *Herren*, the court reasoned that the

record did not demonstrate that plaintiff could do simple, routine, repetitive work because a

medical opinion indicated that plaintiff had a marked limitation in maintaining attention and

concentration for extended periods; a mental status examination found Plaintiff's attention and

concentration to be "borderline to low average range"; and Plaintiff repeatedly complained of

difficulties maintaining concentration. *Herren v. Berryhill*, No. 3:16-cv-1183(WIG), 2018 WL

921500, at *3-*4 (D. Conn. Feb. 16, 2018).  Here, however, the ALJ limited Plaintiff to simple,

routine, low-stress work and pointed to specific medical evidence that showed that Plaintiff

"retained the ability to perform simple, routine, and repetitive tasks, or unskilled work, despite

[his] moderate limitations in concentration, persistence, or pace." *Ana H.*, 2020 WL 6875252, at

*10.  For example, in determining the RFC, the ALJ cited Plaintiff's numerous mental status

examinations that showed that his attention/concentration were within normal limits. (R. 35, 666,

676, 687, 692, 704, 707).  The ALJ also explicitly considered Dr. Rupp-Goolnick's opinion that

Plaintiff had no limitation with simple or new tasks and with maintaining attention and

concentration. (R. 35, 424).  Accordingly, there is substantial evidence in the record to support

the ALJ's determination that Plaintiff's moderate limitation in concentration, persistence and

pace did not hinder him from performing simple tasks.

---

[9] Plaintiff also cites to *Johnson v. Saul*, No. 19-cv-3829(RCL), 2021 WL 411202 (D.D.C. Feb. 5, 2021) for support, (Pl. Br. at 26), but *Johnson* is from the District Court for the District of Columbia and therefore not binding on this Court.

**D. Plaintiff's Subjective Statements**

Plaintiff argues that the ALJ failed to properly evaluate his subjective statements. (Pl. Br. at 26-28).  The Commissioner contends, however, that the ALJ carefully considered Plaintiff's testimony regarding his disabling back pain and mental impairments but found it inconsistent with medical reports indicating a higher level of functioning, as well as with Plaintiff's conservative treatment and activities of daily living. (Comm. Br. at 17-20).

"It is the function of the Commissioner… to appraise the credibility of witnesses, including the claimant…[A]n ALJ is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 762-63 (S.D.N.Y. 2018) (internal quotations and citations omitted).  The regulations state that the Commissioner will "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [his or her] symptoms affect [him or her]." 20 C.F.R. § 404.1529(a).  However, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [his or her] symptoms have on [his or her] ability to work solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. § 404.1529(c)(2).  Furthermore, "an ALJ is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as the evidence of record permits the court to glean the rationale of an ALJ's decision." *Morales v. Berryhill*, 484 F. Supp. 3d 130, 151 (S.D.N.Y. 2020) (internal quotations omitted).

The factors that an ALJ should consider in evaluating the claimant's credibility are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.

*Hamm v. Colvin*, 16-cv-936(DF), 2017 WL 1322203, at *18 (S.D.N.Y. Mar. 29, 2017) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

Here, the ALJ considered Plaintiff's testimony regarding his back pain, including that his condition was not getting any better but instead was worsening, that his pain was severe, and that he rated the pain a 10 out of 10. (R. 32). The ALJ also noted that Plaintiff reported that he was in bed crying every day from the pain. (*Id.*). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not fully supported" by the evidence in the record. (R. 32, 35). Specifically, the ALJ determined that Plaintiff's statements were inconsistent with his "grossly conservative treatment," his activities of daily living, and the medical records. (R. 32-37).

First, when considered in their entirety, Plaintiff's activities of daily living do not support the ALJ's assessment of his subjective complaints. The ALJ stated that Plaintiff provided nearly all the care for his ailing mother, traveled via public transportation, prepared meals and managed money, (R. 32-33), which is supported by Ms. Pettway's 2016 function report on Plaintiff's behalf, (R. 295-99). Further, Plaintiff's own reports, as well as the form from Dr. Esposito, indicate that Plaintiff cared for his very ill mother, including doing "most of the things" for her and assuming total responsibility for her care. (R. 79, 88, 371, 640, 645, 651, 666, 693, 709). The ALJ properly considered this evidence of Plaintiff providing full-time care for his elderly, severely ill mother in evaluating his claims of pain and impairment. *See Ali S. M. v. Comm'r of Soc. Sec.*, 1:20-CV-1487(WBC), 2022 WL 23223, at *5 (W.D.N.Y. Jan. 3, 2022) ("The ALJ

properly determined [p]laintiff's daily activities, which he thoroughly and accurately summarized, were inconsistent with [p]laintiff's statements concerning the limiting effects of his symptoms" where plaintiff cared for his own needs and provided assistance to his elderly mother.); *see also Mark H. v. Comm'r of Soc. Sec.*, 5:18-CV-1347(ATB), 2020 WL 1434115, at *10 (N.D.N.Y. Mar. 23, 2020) (finding that plaintiff's activities of daily living supported the ALJ's credibility determination where "[p]laintiff testified … that he gives his mother her medicine, prepares food for her, and does laundry and cleaning, noting that she does not do much around the home."). However, as Plaintiff points out, his mother died in November 2017, at which point he was no longer providing full-time care, (Pl. Reply. Br. at 3), and his daily activities drastically changed thereafter. For instance, at the hearing in December 2018, Plaintiff testified that since his mother's death, he spent his days watching television, and did laundry in his building a little at a time due to back pain, did grocery shopping sometimes, and cooked a "little bit here and there" but mostly ate out. (R. 79-80). "The mundane tasks of life performed by [P]laintiff do not indicate that []he is able to perform a full day of [even] sedentary work." *Polidoro v. Apfel*, No. 98-Civ-2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999) (collecting cases). In discussing Plaintiff's activities of daily living, the ALJ failed to discuss the time period after his mother's death when he ceased his primary caregiver responsibilities and when he reported worsening pain. (R. 517, 521, 533-36, 545). In sum, the ALJ's characterization of Plaintiff's daily activities is incomplete and not fully supported by the record. Thus, the ALJ improperly discounted Plaintiff's subjective statements on this basis.

Second, the record also does not indicate that Plaintiff's treatment was conservative and thus inconsistent with his complaints of back pain. The ALJ stated that Plaintiff's treatment consisted of approximately two epidural injections, several steroid injections, and pain

medication. (R. 32). The record shows that Plaintiff had at least five epidural, trigger point and/or medial branch nerve injections administered that he consistently stated did not provide lasting relief for his pain. (R. 375, 427, 492, 507, 533-37, 547, 551, 594). Though he noted that epidural injections administered by Dr. Elbaz provided him with more than 80% pain relief, (R. 471-72, 515, 535-36), he continued to return for further injections and eventually expressed interest in a radiofrequency ablation because the injections did not provide long-lasting relief, (R. 492). Plaintiff also stated that he was taking twelve medications, including Percocet, Neurontin, meloxicam and baclofen, which provided moderate relief but did not resolve his pain. (R. 80, 82, 84, 91, 427, 479, 496). "[I]t is highly questionable" that Plaintiff's multiple facet block and epidural steroid injections as well as prescribed painkillers such as Percocet "could be properly characterized as 'conservative.'" *Hamm*, 2017 WL 1322203, at *24; *see also Callahan v. Colvin*, No. 6:14-cv-06553(MAT), 2015 WL 5712334, at *6 (W.D.N.Y. Sept. 29, 2015) (finding that nine epidural injections that did not provide "prolonged benefit" and multiple pain medication prescriptions was not an "especially conservative" treatment plan). Thus, it was error for the ALJ to reject Plaintiff's subjective statements on this ground.

Third, the ALJ also improperly claims that the medical records support her credibility determination. She considered evidence that Plaintiff's asthma was well-managed, and that his mental health findings were generally benign. (R. 32). The record supports this finding. Plaintiff's asthma was well-managed, (R. 570, 621, 634, 643, 727), and the record reveals generally normal mental health findings, outside of anxiety and grief surrounding his mother's illness and passing, (R. 423-24, 645, 651, 666, 668, 676, 686-92, 703-11, 714-17, 751-52). However, the ALJ inaccurately stated that "multiple examination findings from other examiners consistently note 5/5 strength," (R. 32), where records consistently stated Plaintiff's muscle

strength was 4/5. (R. 467, 471, 483, 485, 487, 489, 491, 493, 495, 499, 506).  Further, the ALJ

ignored evidence of Plaintiff's frequent complaints that his back pain was aggravated by sitting,

standing and walking, (R. 444, 474, 476, 484, 487, 494, 500, 504, 517, 521, 525, 529, 533, 537,

541, 545, 549), as well as his repeated statements that his back and neck pain were worsening.

(R. 375, 427, 479-80, 482, 492, 496, 507, 517, 521, 533-37, 545, 547, 551, 594).  Thus, the ALJ

selectively cited to the record to support her conclusion, while ignoring evidence that Plaintiff's

pain was aggravated by sitting/standing/walking and kept returning or worsening. *See Shafer v.*

*Saul*, 20-cv-3060(VSB)(DCF), 2022 WL 827075, at *19 (S.D.N.Y. Jan. 20, 2022), *report and*

*recommendation adopted,* 2022 WL 826411 (S.D.N.Y. Mar. 18, 2022) ("In finding… that

Plaintiff was not as limited as she alleged, the ALJ highlighted only isolated and seemingly date-

specific portions of the medical record that he had summarized" without attempting to reconcile

evidence of Plaintiff's pain worsening).

　　　　Accordingly, the ALJ improperly rejected Plaintiff's subjective complaints warranting

remand.

## III.  CONCLUSION

　　　　For the foregoing reasons, Plaintiff's motion is granted, the Commissioner's cross-motion

is denied, and the case is remanded for further proceedings consistent with this Opinion.  The

Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 18

and 20) and close the case.

Dated:    September 20, 2022
          White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge